IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2010 Session

## WILLIAM CAMERON CONE v. GEORGIA ELISE DUNN CONE

**Appeal from the Circuit Court for Robertson County**
**No. 10443     Ross H. Hicks, Judge**

---

**No. M2008-02303-COA-R3-CV - Filed April 29, 2010**

---

In this post-divorce custody dispute, mother challenges the trial court's decision to change the primary residential parent to father. The trial court found mother's allegations of sexual abuse to be unfounded, and the evidence does not preponderate against the trial court's determination. We find no error in the trial court's modification of the primary residential parent or in its denial of mother's requests for post-judgment relief. We therefore affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Cynthia A. Cheatham, Manchester, Tennessee, for the appellant, Georgia Elise Dunn Cone.

Grant Charles Glassford, Brentwood, Tennessee, for the appellee, William Cameron Cone.

Ben H. Cantrell, Nashville, Tennessee, and Alene Ross Levy, Houston, Texas, for the Amicus Curiae, Justice for Children.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Georgia Dunn Cone ("Mother") and William Cameron Cone ("Father") were married on November 30, 2002, in Phoenix, Arizona. Cameron Forest Dunn Cone ("Child") was born on August 31, 2003. Mother and Father separated soon thereafter in December 2003.

Father filed a petition for divorce in Missouri,[1] and Mother filed a petition for divorce in the Circuit Court of Robertson County, Tennessee. Mother's petition included allegations that Father was abusive, suicidal, a sexual addict, and a pathological liar.

The Missouri court granted Mother and Father a divorce on April 25, 2005, but declined to rule on any issues related to Child, who lived in Tennessee, or any property located in Tennessee.

In May 2004, Father filed a motion in Robertson County circuit court requesting reasonable parenting time, and Wife filed a motion for an extended restraining order and a motion for psychological testing, a polygraph, and sexual preference testing of Father. The parties entered into an agreed order continuing the hearing on these motions until July 2004 and allowing Father to have supervised visits with Child at Wife's residence in Cross Plains, Tennessee; the order specified that Father was not conceding that supervised visitation was necessary. A week later, Mother sought an order of protection based upon an incident during Father's visitation with Child when Father allegedly became belligerent.

After a hearing in July 2004, the court denied Mother's motion to extend the restraining order and petition for an order of protection, denied Mother's motion for testing of Father, and granted Father unsupervised parenting time with Child. Father could not take Child out of the jurisdiction. In its order, entered on September 16, 2004,[2] the court decreed that Father would begin to have overnight parenting time on alternate weekends beginning on October 2, 2004.

Medical records show that, on multiple occasions beginning in July 2004, Mother expressed concerns to physicians treating Child about possible physical or sexual abuse by Father. These concerns arose in part out of the fact that Father's father, a psychiatrist, had been convicted and imprisoned for sexual abuse of patients and Mother's suspicion that sexual problems ran in Father's family. In September 2004, Mother took Child to the emergency room after finding what she described as a pubic hair in the child's diaper. The emergency room physician found no evidence of abuse, and the Department of Children's Services concluded that the allegations were unfounded.

In October 2004, Mother told a physician that she continued to be very concerned about sexual assault by Father. The physician referred Child to a pediatric urologist, Dr. Mark Adams, to whom Mother reiterated her concerns about sexual abuse. Dr. Adams

---

[1]Father is a veterinarian in Missouri.

[2]Disagreements between the parties as to the contents of the order delayed its entry.

reassured Mother that the condition of Child's penis in no way suggested abuse. Child was not circumcised, and the pediatrician advised Mother that circumcision was medically indicated, but Mother preferred to keep the child uncircumcised.

After a status conference in January 2005, Father's parenting time was increased, and he was permitted to take Child out of the jurisdiction.

At a pediatrician visit on June 9, 2005, Mother described increasingly aggressive behavior by Child. Child had not received any immunizations, and Mother and the doctor discussed an immunization schedule.

On June 13, 2005, the trial court held a hearing to determine a permanent parenting plan. Over the next several months, the parties disagreed over the contents of the trial court's decision.

On June 17, 2005, Mother took Child to another doctor, Dr. Paul Yim, not a pediatrician, complaining that Child had a swollen penis and behavior changes. Dr. Yim noted penile redness, no foreskin edema, and the foreskin was mildly retractable. He suggested that Mother consult a psychologist concerning the behavior changes and a urologist. He noted that Mother was considering taking Child to Our Kids Center.[3] In his deposition testimony, Dr. Yim stated that penile redness was not unusual in an uncircumcised child, that he was not familiar with Our Kids, and that he did not suggest taking Child to Our Kids. Mother and Child returned to Dr. Adams, whose notes indicate that Mother was "very very focused" on abuse concerns. He assured her at length that Child's physical condition was normal.

In August 2005, Mother saw Dr. Yim again stating that Child reported pain in his anal area. There were no findings on exam. In October 2005, at a visit with one of Child's pediatricians, Mother reported that Child was not sleeping well and that she suspected sexual abuse by Father. The pediatrician found no physical evidence of abuse. A few weeks later, at a visit with another pediatrician in the practice, Mother reported that Child had just returned from visitation with Father and was sick. Child complained of his bottom hurting, and Mother saw a patch of redness. Mother again stated that sexual abuse ran in Father's family. The doctor found nothing unusual and prescribed medication for coccyx pain.

The permanent parenting plan was not actually signed and entered by the court until October 27, 2005. Mother was named the primary residential parent, and Father had

---

[3]Our Kids Center is a facility for sexually abused children.

parenting time on alternating weekends in three- or four-day increments. Father had longer parenting time periods during the summer months.

Father remarried in November 2005.

Beginning on June 6, 2007, Mother took Child to Kathy Clanton Reeves, a clinical psychologist in Kentucky, who conducted play therapy with Child.

Father had parenting time with Child from June 10, 2007, through June 24, 2007. On June 25, 2007, Mother took Child to Dr. Victoria Rundus, a pediatrician in the same practice with the other pediatricians who had treated Child, for a check-up. Dr. Rundus found bruises on Child's buttocks and noted that Child was "in counseling for possible sexual abuse by the father." The next day, Dr. Rundus referred the case to the Department of Children's Services ("DCS"). The following statement appears in Dr. Rundus's records:

> I saw patient for WCC yesterday and several bruises noted by me to his buttocks, discussed at length with mom family history of sexual abuse/incest on the paternal side. MGF is in prison secondary to conviction of sexual battery. Forest's Father allegedly was abused by his father and Father has admitted to a pornography addiction. Forest sees Father in Missouri every other w/e. Mom asked Forest about some redness to his penis recently and patient stated "that is where Daddy put the handle" and then he made movements with his arms as if he were striking his penis. I am concerned about the possibility of sexual abuse to Forest by his father and have made a referral to DCS Central Intake . . . .

Child had his second play therapy appointment with Dr. Reeves on June 29, 2007. Dr. Reeves noticed a mood change in Child, who "interacted with the toys this session in a very destructive manner." She also noted bruising on Child's face.

The DCS referral by Dr. Rundus was investigated by Detective Angela Looney of the Robertson County sheriff's department. On July 5, 2007, Sarah Lynch, a DCS case manager, interviewed Child at his home; Detective Looney was present during the interview. When Father arrived at a McDonald's restaurant to pick Child up for parenting time on July 6, 2007, he was met by Detective Looney and Ms. Lynch, who informed him that he would not be permitted to pick up Child because of the ongoing investigation of allegations of sexual abuse of Child by Father and his wife, Mary Jo Cone.

On a referral from DCS, Our Kids Center performed a "medicolegal evaluation" of Child on July 12, 2007. Mother accompanied Child to the evaluation, and the report includes

extensive history given by Mother. The physical examination was described as "within normal limits for the anogenital portion of the exam." The report notes that "[a] normal exam neither confirms nor rules out the possibility of sexual contact." Cultures and samples were taken for testing.

Father filed a petition to modify the parenting plan on July 13, 2007. He denied that he had abused Child in any way and requested that he be made Child's primary residential parent. Later that month, Mother filed a motion to suspend visitation during the sexual abuse investigation. After a hearing on July 31, 2007, the court granted the joint motion for the appointment of a guardian ad litem and granted in part and denied in part Mother's motion to suspend visitation during the investigation. Father was given supervised parenting time for two-hour sessions on two consecutive days on alternating weekends. The parenting time sessions were to occur at the Exchange Club Family Center in Nashville or at the Family Guidance Center in Clarksville.

During the DCS investigation, Father agreed to be interviewed. On the day of the scheduled interview, however, the detective stated that it would be a waste of time to interview Father if he was going to deny the allegations and make a "self-serving" statement. Thus, the detective chose not to conduct an interview with Father. Father also agreed to take a polygraph test, but his attorney objected to the preliminary test questions proposed by the sheriff's department.[4]

Child attended more play therapy sessions with Dr. Reeves on June 29, 2007, and four dates in July 2007. On July 31, 2007, Dr. Reeves wrote a letter to Ms. Lynch at DCS summarizing her treatment of Child to date. Dr. Reeves described her observations from each play therapy session and noted the following themes:

> 1) A marked mood change was noted following the extended visitation with his father. This mood change has since calmed in the absence of visitation with his father.
>
> 2) Forrest [sic] identifies he has two separate identities:
>     a. Forrest [sic] with mom; and
>     b. Cameron–mad with dad.[5]

---

[4]The first control question was: "Have you ever lied to a person of authority?"

[5]Mother called Child by the name "Forest," and Father called him "Cameron."

3) Forrest has projected observing his dad's anger and has projected negative feelings toward his dad.

Based upon the identified themes, Dr. Reeves recommended that Child remain in individual play therapy, with the hope that Father "can be integrated into his therapy to resolve these issues (contingent upon a recommendation from the Department of Children's Services)." Dr. Reeves also recommended a comprehensive psychological evaluation of Father and that Child's visitation with Father "remain suspended (as imposed by Children's Services) throughout the duration of the investigation and subsequent treatment recommendations."

On August 3, 2007, Ms. Lynch notified the Missouri child abuse hotline. In a written summary of the DCS investigation, Ms. Lynch made the following statements:

> Child Protective Services Investigator/Forensic Interviewer interviewed the child on 07/05/2007. Cameron Forest Dunn Cone gave a detailed discloser [sic] of the events that happen to him with his body while he is in the care of his father, Dr. Cone and his step-mother "Jo" (Mary Jo Kenney Cone). The Department of Children's Services in Robertson County does not have jurisdiction over this case since we cannot prove that any of the alleged abuse was to have happened in Robertson County. CPS Lynch will be sending all information she has collected in the process of the investigation to the designated worker for Missouri so that the case can be further investigated in the county where the father resides.

The information sent to Missouri included a transcript of the July 5, 2007 interview with Child.

In a letter dated September 4, 2007, the Missouri Department of Social Services notified Ms. Lynch of its conclusion that the allegations were "unsubstantiated" based upon a "finding of insufficient or no evidence for the allegations of abuse or neglect." The letter informed Ms. Lynch that she could request that the case be referred for review.

On September 26, 2007, Ms. Lynch presented the case to DCS's Child Protective Investigative Team (CPIT). The CPIT review team consisted of Ms. Lynch, Detective Looney, and representatives from law enforcement, the district attorney's office, juvenile court, mental health professionals, and the child advocacy center. CPIT recommended that the case be closed with a classification of "allegation indicated/perpetrator indicated."

The guardian ad litem filed a motion for independent psychological testing of the parties and independent testing of Child, and the motion was heard on October 2, 2007. The

court ordered the guardian ad litem to notify counsel for both parties of the independent examiner she would select for psychological testing, and the parties were given time to provide the guardian ad litem with all documentation they wanted provided to the examiner prior to the evaluations. Father's supervised parenting time was increased to three hours per visit.

In a letter dated October 3, 2007, Ms. Lynch notified Father that DCS had identified him as an "indicated perpetrator of child neglect or child abuse involving [Child]." Attached to the letter was a case file review form. Father requested an administrative review.

Child continued to see Dr. Reeves for play therapy. In a letter written to Mother's attorney on October 11, 2007, Dr. Reeves opined that, "Based on the clinical/play sessions with this child, Forest projects clinical data consistent with a child who has been sexually abused." She stated that Child's projections reflected anger toward Father and that Child identified Father "as the adult male figure in his sexually inappropriate projections."

On October 23, 2007, Mother recorded her own interview with Child. The next day, Child attended play therapy with Dr. Reeves, who summarized the first part of the session as follows:

> Forest entered this session having his mom carry him into the therapy room. He quickly engaged in the cooking center. Mom quietly (Forest seemed uninterested in the adult quiet exchange), shared her concern over statements Forest had made to her the previous night. She related she had recorded this conversation and wanted to know if this therapist felt it would be helpful for her to listen to the tape. This therapist informed mom, it would be more beneficial to the therapy process if Forest could share the conversation in the therapy session. The therapist asked mom to ask Forest if he would share their conversation with Dr. Cathy. Before mom could leave the therapy room, Forest stated, "I poked her butt." When asked whose butt he responded, "Mary Jo's." He then proceeded to collect the daddy and the mommy doll and put them on the floor. He began to wrestle with them. As this behavior continued he became short of breath and seemed unaware this therapist and mom were still in the room. His mom sat quietly on the couch while he projected this behavior. When engaged in this wrestling behavior with the dolls, he spontaneously stated, "He poked my bottom with a stick." He did not respond when asked who poked his bottom with a stick. During this entire wrestling activity with the dolls, Forest talked angrily to the dolls and only responded when this therapist placed a pillow under his head when it appeared he was becoming more aggressive in his play. . . . [Mother leaves the room.] When

asked to tell this therapist about what had happened he responded, "Dad put a stick in my butt." When asked what he did he stated, "I fought him. I fought him and Mary Jo. Steve and Sammy were there too." . . . .

During the period from November 15, 2007, through December 21, 2007, Dr. William Bernet, a psychiatrist, and Dr. James S. Walker, a clinical psychologist, performed an independent evaluation of Mother, Father, and Child at the request of the guardian ad litem. Drs. Bernet and Walker gathered information from numerous sources. Dr. Walker conducted psychological testing of all three family members, and Dr. Bernet conducted forensic psychiatric evaluations of each family member.[6] In an extensive report dated February 12, 2008, Dr. Bernet and Dr. Walker concluded that Child was not sexually abused by Father and recommended that Father should be Child's primary residential parent. One reason for their recommendation concerning the primary residential parent was that Mother was "preoccupied with the mistaken idea that Dr. Cone has abused Cameron Forest." Drs. Bernet and Walker also recommended that Father receive counseling "to help him deal with his anger, his relationships with other people, and to address issues that may arise regarding Cameron Forest." They recommended that Mother have counseling "to help her deal with her strong feelings regarding Dr. Cone and her suspicions of him." Drs. Bernet and Walker did not feel further counseling was necessary for Child at present.

On February 15, 2008, Father filed a verified motion for unsupervised parenting time or immediate temporary possession of Child and for a restraining order. After a hearing on March 6, 2008, the court entered an order providing that Father's parenting time would no longer be supervised and that he was restored to the parenting time set forth in the October 27, 2005 permanent parenting plan.

In May 2008, DCS notified Father that his administrative review would be stopped until the final decision in these civil proceedings.

After the Missouri Department of Social Services found the abuse allegations to be unsubstantiated, Mother's attorney sent a copy of Ms. Lynch's interview with Child and other materials along with a letter to the prosecuting authorities in Missouri. In May 2008, the Taney County Sheriff's Department issued a report on the abuse allegations regarding Child. The report includes the following statement: "[I]t appeared as though [Ms. Lynch] had set a goal for herself when talking with the victim. The conversation was led by her in the direction she wished to take. It was obvious the interview was suggestive in nature." The report also noted Mother's focus on Father's father's history of abuse and the lack of any

---

[6]Dr. Bernet met with Father for over five hours, Mother for over 8 hours, and Child for over 2 hours.

documentation of physical injuries. As to Mother's October 2007 interview with Child, the report states: "Mother focuses on certain points and appears leading in her questioning and misinterpreting what her son is telling. The recording is questionable as to the reality of what actually (if anything abusive) took place." The Taney County Prosecuting Attorney's Office notified the parties' attorneys that it declined to pursue any criminal charges against Father because there was "a lack of evidence that any crime has been committed against this child."

THE TRIAL

The case was heard over a period of six days in July 2008. On the first two days of the trial, the court heard testimony from the parties' experts. Dr. Bernet and Dr. Walker testified about their evaluation of Mother, Father, and Child and their report. Mother put on testimony from Dr. Marc Ackerman and Dr. David McMillan, clinical psychologists who had reviewed the Bernet/Walker report but had not interviewed the parties or Child. Dr. Rundus, pediatrician, then testified about her treatment of Child and her report to DCS. The court also heard testimony from Dr. Gordon Heseman, a Missouri veterinarian who sold his practice to Father, about his observations of Father's relationship with Child.

Sarah Lynch, DCS employee, testified on the second day of the trial. She stated that she had interviewed Child at Mother's home with Detective Looney present and that the interview was not videotaped. According to Ms. Lynch, Child was more attentive when she addressed him as Forest than when she called him Cameron. Ms. Lynch testified that, after the CPIT review, the case was closed due to lack of jurisdiction because there was no proof that the alleged abuse happened in Robertson County. The trial court was provided with two transcripts[7] of Ms. Lynch's interview with Child, and the audiotape of the interview was played during the hearing.

On cross-examination, Ms. Lynch agreed that there were a lot of distractions in the place where she chose to interview Child. When asked to rate the productiveness of the interview, Ms. Lynch stated: "On a scale of one to ten, ten being probably the smoothest they could be, one being difficulty as far as being able to keep the child involved in the interview or something, I would say that this one was probably a three." As to the information gained, Ms. Lynch rated the productiveness as a level six, considering the child's age at the time (not yet four years old).

On day three, Mother was questioned by Father's attorney and the guardian ad litem. Mother described the ranch where she lived and acknowledged that she had occasionally had people stay overnight at her house. One man stayed at Mother's house for a couple of

_____

[7]One transcript was done by DCS, the other by a court reporter.

months; he was a friend of Mother's friend in California and did some work at the ranch. On another occasion, a worker stayed overnight at Mother's house because he had completed work very late. When Mother had to be gone for a day or weekend for her work in the horse business or as a makeup artist, Child would be taken care of by a family that had known Child since he was a baby.

When asked whether she believed that Father had sexually abused Child, Mother stated, "I don't know what to believe regarding that," and cited the conflicting opinions of various professionals. According to Mother, Child's behavior had become calmer and less aggressive after his visitation with Father was discontinued when the DCS investigation began. Once Father began having unsupervised visits again earlier that year, Child began wetting the bed and urinating on furniture and rugs.

Mother testified that she felt she had "always facilitated a very harmonious and . . . very loving relationship" between Father and Child and had tried to insure that Child was not affected by the controversy over possible sexual abuse. Asked what visitation schedule she desired for Child, Mother testified as follows:

> A. . . . Having got such conflicting information throughout the last year, and because I don't know that anyone can rule it out entirely, and certainly nobody can say it definitely happened, I would have to say my most comfortable place would be supervised visitation until Forest was a credible, older child who could speak for himself. But, you know, I would just–I just want Forest's life to be really normal. I just want it to be really normal. And whatever way we can make it that, that's what I want.
>
> Q. Do you think he's a credible child now?
>
> A. According to the experts, no. You know, they are saying he is not. And they say that he confabulates, and we all hear that. He clearly confabulates. Does that mean you can disregard everything he says? No, I don't think so. But who could ever say what's truth and what's fiction? We will never know, so you've just got to move on.
>
> Q. . . . Will you ever be comfortable with Dr. Cone having unsupervised visitation with Forest?
>
> A. Yes. I think when Forest is a little older, I would, because, you know, he would be older. He would be not as vulnerable.

-10-

On day four of the hearing, Detective Looney testified. Based upon her observations during the forensic interview of Child, Detective Looney felt Child was more cooperative and comfortable when addressed as Forest, whereas he seemed "mad and upset" when he was called Cameron.

On cross-examination, Detective Looney testified that Mother had given her an eight-page list of questions she wanted asked of Father during a polygraph. She further stated that when she went to Mother's house on July 3, 2007, as part of her investigation, Mother and Child were not at home but that Fred Greene, one of Mother's attorneys in this case, was there. The detective recalled that Mr. Greene informed her that he was aware of the abuse allegations and told her that Father's father was in prison.

Counsel for Father cross-examined Detective Looney about a meeting on July 23, 2007, at the sheriff's department. She admitted that Father appeared to do an interview but Lieutenant Bennett did not want to conduct an interview if Father was going to deny the allegations and make a "self-serving statement."

Detective Looney acknowledged that Child had made statements during the interview about Father, Mother, and his stepmother touching his penis. Her impression of the interview was that his statements were focused mainly on Father. When asked to rate the quality of the forensic interview of child, Detective Looney stated: "It wasn't the best interview; one, because he was in his room, all over the place, kind of, instead of being dedicated to sitting in one place." She admitted that Child was not concentrating well during the interview. The detective acknowledged that Child's statements were the main reason the CPIT indicated Father.

Mary Jo Cone, Father's wife and Child's stepmother, testified that she and Father had been married from 1994 until 2002 and had remarried in 2005. During their first marriage, Mary Jo Cone's two daughters from a prior marriage lived in the household. Mary Jo Cone testified that Father was an active parent with the two stepdaughters and continued to have a good relationship with them as adults. She described Father as being a loving, engaged parent with Child and denied that Father or she herself had abused Child in any way.

Father testified on day five of the hearing. He described the arrangements he had made for Child in the event he became the primary residential parent. Father also described his parenting time with Child. Father testified that since June 2005 when the court named Mother the primary residential parent, Mother had started videotaping the meetings when they exchanged Child.

Father expressed concern over some statements made by Child about how to make a baby. He also recounted a conversation Child had with Mother over the telephone in which Child told Mother, "I got a booboo . . . now that I've told you about the booboo, I want the present." He then clarified to Mother: "Mom don't you remember that if dad hurt me, you would get me a present."

Father testified that Child's problems with bedwetting had been alleviated by curtailing his fluid intake in the evening. Father also took Child to the bathroom once during the night. With these adjustments, the bedwetting issues had resolved. Father testified that he had not observed Child displaying head banging, tantrums, or other behaviors reported by Mother.

During the parenting time immediately prior to the appointment with Dr. Rundus when she noticed bruising on Child's buttocks, Father and Mary Jo Cone had taken Child to two water parks.

When asked why he thought he was better suited to being Child's primary residential parent, Father testified that he could "facilitate a healthy upbringing for Cameron, because he will not be subjected to the things that he's been subjected to [repeated sexual abuse medical exams, interviews about abuse] with me."

Portions of a videotape of a supervised visit between Father and Mary Jo Cone and Child were played for the court.

Father testified that he and Mother had many conversations about his father's sexual addiction and the effect on Father, but he never told Mother that he, Father, was a victim of physical incest. Rather, Father sometimes felt that he had been a victim of emotional incest in the sense that his father discussed inappropriate sexual matters with Father when he was a child.

The court heard testimony from the headmaster of the private school where Child attended pre-kindergarten concerning Child's preschool performance.

Dr. Reeves, Child's therapist, testified that Mother brought Child for therapy because of concerns about his aggressive behaviors, including "wanting to touch his mom's private parts," "trying to kiss her with his tongue," and "a preoccupation he appeared to have with animals mounting each other, and making statements that that's what mom and dads do." Mother told Dr. Reeves that there was no current custody dispute and informed her about relevant family history, including Father's father being in jail for sexual assault.

In her testimony, Dr. Reeves summarized her play therapy sessions with Child. She then identified themes and patterns of behavior of sexually abused children that she found threaded through her notes regarding Child: "Playing out sexual acts; interest in intimate parts; some disassociation or trance-like behavior; regressed behavior, including sucking on a baby bottle and sucking on a teapot lid; aggressive play; feeding himself with the baby bottle; nurturing and taking care of the babies; car chases, in which there was increased speeds and crashes; good guys/bad guys; baby dolls hitting parental figures." Dr. Reeves opined that Child was able to differentiate between pretend and real statements that he had told her.[8]

Mother testified again as part of her own proof. She described the environment at the ranch in which Child lived with her. She went over some of her interrogatory responses regarding Father's statements to her of sexual abuse and sexual addictions in his family. According to Mother, Father expressed to her fears that he might endanger Child.

According to Mother's testimony, from around the time Child reached the age of two (which occurred in August 2005), he began making sexually inappropriate comments and behaviors, became fixated on human and animal genitals, and described inappropriate comments or behaviors made by Father. Mother stated that Child told her that Father told Child his penis was soft and touched his penis, and that Father had poked him in the bottom with a broom handle. Mother testified that these statements and behavior began within a month or two of the divorce and had continued. She had observed "an incredible focus on genitalia and sexually acting out."

On cross-examination, Mother admitted that she had not included Father's name or contact information on Child's school application form. She acknowledged that she did breed horses at her ranch but denied that Child might have picked up some sexual content at the farm. Mother breastfed Child until he was three years old. She testified that, when Child told Dr. Bernet that he drank from Mother's "boobies" that day, "he was making that up."

After hearing the proof, the court asked both parties and the guardian ad litem to prepare proposed findings of fact and conclusions of law.

---

[8]As part of the proof, the court also considered the deposition testimony of Elizabeth Kenney (Father's stepdaughter), Dr. Jason Kastner (one of Child's pediatricians), and Dr. Yim (another doctor who saw Child).

The trial court entered a thorough 20-page memorandum opinion and order on September 9, 2008. The order includes factual findings concerning DCS's investigation and conclusions:

> The court finds the assessments and conclusions reached by Ms. Lynch and the child protective investigative team to be clearly erroneous. The court noted no difference in the child's attentiveness based on the name by which he was addressed. On the contrary he was inattentive and disruptive throughout. The interview itself was conducted in a manner which violated DCS protocol. It was not scheduled in a timely manner; it took place at the alleged victim's home; it was conducted by an inexperienced interviewer; Det. Looney was allowed to participate in the interview; Ms. Lynch failed to establish any rapport with the child; Ms. Lynch did not follow up on the one clear statement made by the child regarding abuse, a statement which implicated the Mother; and the interview was conducted in an incompetent manner. The interviewer clearly lost control of the interview; became impatient; offered repetitive, leading and suggestive questions; and relied upon information gained only from the Mother or Mother's counsel, which in and of itself made an impartial evaluation of the interview by Ms. Lynch unlikely if not impossible.
>
> The court finds that nothing in the interview provides any evidence that any disclosures were actually made by the child. In addition to its own assessment of the interview made while listening to the audiotape and reviewing the transcript, the court also relies on the testimony of Dr. William Bernet in making this finding. Dr. Bernet described the interview as disorganized and indicated that no conclusions could be drawn from it whatsoever because the child was "all over the map"; the interviewer offered suggestive questions; the interview was audiotaped rather than videotaped; the location was wrong; and the child "confabulates" by saying that adults want him to.

In its order, the court discussed the Bernet/Walker report and summarized the report's conclusions. The court noted the report's findings with regard to Father's psychological weaknesses involving anger. With respect to Mother's psychological issues, the court stated that Mother "had a style of looking to find fault with [Father] even to the point of distorting or misrepresenting his actual behaviors" and that "[s]he has consistently searched for proof of her firmly held belief [that Father had sexually abused Child], and she encouraged the child when he made statements consistent with her belief."

After reviewing the Bernet/Walker recommendations and the reasoning behind them, the court concluded: "Based on the court's familiarity with the Mother and the lengthy history the court has with her and this litigation, the court accepts in full the Bernet/Walker psychological assessment of the Mother." The court noted that "despite the court having found the allegations against the Father [at the hearing in June 2005] to be untrue, and despite the court's admonitions to her, [Mother] waited only four days after the court's ruling before initiating new efforts to deny and restrict Father's visitation by making statements about Father to others which this court has found to be false and/or misleading." The court went on to highlight the Bernet/Walker documentation of Mother's psychological weaknesses that have a negative impact on her parenting abilities:

> [Mother] portrays her behaviors and motivations in a very positive light. She appears to lack insight into the strong feelings and motivations that are driving her behavior in casting Will Cone as a child abuser and unfit parent. She has become obsessed and fixated upon her negative campaign to denigrate Dr. Cone, regardless of the negative impact her behavior is having upon her son and her son's relationship with his father. She evidences narcissistic personality traits, with a strong sense of entitlement, a willingness to exploit others to achieve her own ends, and a lack of empathy or ability to recognize or identify the feelings and needs of others with whom she is in a relationship. Her defensive style is marked by projection, that is, rather than correctly understanding the feelings and motivations of others, she inaccurately perceives others to be acting out the negative feelings that she in fact possesses, including anger, hatred, and entitlement.

The trial court also addressed the conclusions reached by Dr. Reeves, emphasizing that the alleged disclosure occurred the day after Mother's tape-recorded conversation with Child, and on the only day when Mother carried Child into the play therapy room. The court remarked that, as observed by Dr. Bernet, Mother tried "to elicit information through repetitive and suggestive questions." The interview violated the safety plan signed by Mother in July 2007, which stated that no one was to speak to Child about the sexual abuse allegations other than Dr. Reeves and DCS. Also of significance to the court was Dr. Reeves's failure to listen to the entire recorded interview by Mother; because she did not listen to the tape, Dr. Reeves "did not realize how these statements came about and were reinforced by Mother."

After summarizing the evidence, including all of the expert testimony, and stating its factual findings, the court set out conclusions of law, beginning with its conclusion that Father had met the burden of proving that there had been a material change of circumstances since the October 27, 2005 order. The court then made conclusions with respect to each of

the best interest factors pursuant to Tenn. Code Ann. § 36-6-106(a), found the allegations of sexual abuse by Father to be untrue, and expressly agreed with and accepted the Bernet/Walker report. The court determined that it was in Child's best interest for Father to be made the primary residential parent.

Mother filed a timely notice of appeal. On March 5, 2009, Mother filed a motion pursuant to Tenn R. Civ. P. 60.02(5) challenging the September 2008 order, as well as the order and judgment entered on December 2, 2008. Mother also sought recusal of the trial judge from all further proceedings based upon an alleged post-trial conversation between the trial judge and one of Mother's former attorneys in this matter, Roger Maness. In her motion, Mother alleged that "the court's erroneous perception of the relationship [between Mother and attorney Greene] biased him against [Mother] and her counsel, and played a substantial role in Judge Hicks' negative assessment of the evidence and the parties' credibility during the trial." This court remanded the case to the trial court for consideration of Mother's motions.

On June 15, 2009, the trial court denied Mother's Rule 60 motion and her motion for recusal.

ISSUES ON APPEAL

Mother asserts that the trial court erred in changing the primary residential parent to Father based in large part on Tenn. Code Ann. § 36-6-106(a)(10) (the parent's willingness to foster a close relationship with the other parent) when DCS had determined that Father had sexually abused Child. Mother argues that the trial court erroneously reviewed and rejected DCS's findings of sexual abuse and that the court's modification of the primary residential parent in this case violated the Protective Parent Reform Act, Tenn. Code Ann. § 36-6-112. Mother further asserts that the trial court erred in denying her request for Rule 60 relief and for recusal and in supplementing the record. An amicus curiae brief was filed on behalf of Justice for Children, a child advocacy group, asserting that the trial court improperly relied on parental alienation syndrome in making its custody determination. Father seeks an award of attorney fees on appeal on the ground that Mother's appeal is frivolous.

ANALYSIS

Primary residential parent

Mother argues that the trial court erred in making Father the primary residential parent because the court improperly relied upon Tenn. Code Ann. § 36-6-106(a)(10) as the most

-16-

significant factor despite DCS's indication of Father as a child sexual abuser; improperly overturned DCS's findings; and acted in violation of the Protective Parent Reform Act.

Our review of the trial court's findings of fact is de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Marlow v. Parkinson*, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007). Determinations regarding custody "often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). We "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007).

It is well-established that, in order to modify a parenting plan to change the primary residential parent, the trial court must apply a two-part analysis: the court must find that "both a material change of circumstances has occurred and a change of custody is in the child's best interests." *Kendrick*, 90 S.W.3d at 575. Tenn. Code Ann. § 36-6-101(a)(2)(B) is the relevant statutory provision as to what constitutes a material change of circumstance in the context of a custody change:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

As noted by the court in *Kendrick*, "'[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody.'" *Kendrick*, 90 S.W.3d at 570 (quoting *Blair v. Bandenhope*, 77 S.W.3d 137, 150 (Tenn. 2002)).

Mother's arguments attack the trial court's best interest determination; they do not address the trial court's finding that there had been a material change of circumstances since the October 2005 order. The evidence does not preponderate against the trial court's finding of a material change of circumstances.

We begin our review of the trial court's best interest determination by examining the effect of DCS's indication of Father as a perpetrator of child abuse. DCS made an investigation and found sufficient evidence to indicate Father as a sexual abuse perpetrator. The agency then notified Father that he was entitled to a review of this decision, and Father filed the appropriate request for review. By that time, Father had initiated this court action to modify the parenting plan, and DCS essentially put its administrative review process on hold during the court proceedings. The DCS indication reflects the agency's initial decision, made without interviewing Father or holding any kind of hearing. While this finding was entitled to some weight in the trial court's decision, it was not final or binding upon the court.[9] We reject Mother's argument that the trial court failed to give sufficient weight to the DCS findings.

In making its best interest determination, the court is to consider the factors set forth at Tenn. Code Ann. § 36-6-106(a). The trial court in this case considered each of the statutory factors as follows:

a. Both parents love this child and have appropriate affection (factor 1).

b. Both parents have provided food, however, the child's educational needs are not being met and the medical care has been neglected as evidenced by the failure of the Mother to have the child immunized. Further, the Mother's actions with regards to her continued medical visits and complaints of sexual abuse and her continued exposure of the child to examinations for sexual abuse is not in the best interest of the child and weighs in favor of Father (factor 2).

c. The child has primarily resided with the Mother (factor 3).

d. The Mother has allowed other people, including men she has only known for a week, to stay at her home overnight, which is a concern (factor 4).

e. Both parents are physically healthy, however, the Father has anger issues, and the mother is preoccupied with the alleged sexual abuse of the child by the father, and this will have a negative impact on the child in the future according

---

[9]This court is mindful of the proposition that, "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *Morris v. Esmark Apparel, Inc.*, 832 S.W.2d 563, 566 (Tenn. Ct. App. 1991). In the present case, however, DCS's decision was not final, and the agency was not acting in a judicial capacity as there had been no administrative hearing.

to Drs. McMillan, Bernet and Walker (factor 5). There is no evidence that Father's anger issues have had any negative impact on the child, however, there is overwhelming evidence that Mother's falsely founded obsession has had and will harm the child.

f. The home, school, and community record of the child shows that he is not progressing in school as he should and this weighs heavily in favor of the father. Further, the child continues to act out sexually in the mother's home and around other children (factor 6).

g. There is no evidence of physical or emotional abuse of the child by Father. However, Mother is convinced that the father has sexually abused the child. This falsely held belief on her part and her false accusations against Father is in and of itself abuse of the child according to Dr. Ackerman. This weights [sic] heavily in Father's favor (factor 8).

h. The most significant factor is that the Mother has not been willing to facilitate and encourage a close and continuing parent child relationship between the child and the other parent. This is evidenced by her continued attempts to convince health care professionals that the Father is a sexual victim and abuser and that this child has been abused. She continues to insist that there should be supervised visitation between the child and the father. This heavily weighs in favor of the father (factor 10).

From the beginning of these proceedings in 2004, the Mother has repeatedly attempted to restrict Father's contact with his son. Substantially all of the allegations made by [Mother] in the current proceedings were made to this court through various pleadings, motions and evidentiary hearings in 2004 and at the hearing in 2005. The court finds the latest allegations, specifically those of sexual abuse on the part of the Father to be untrue.

Based upon its analysis of the statutory factors, the court concluded that "the child's best interests are served by transferring the designation of primary residential parent from Mother to Father."

Mother takes the position that the trial court erred in considering statutory factor 10 as the most significant factor in light of DCS's indication of abuse. Tenn. Code Ann. § 36-6-106(a)(10) requires the court to consider:

Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

As Mother points out, the court must also consider any evidence of child abuse as required by Tenn. Code Ann. § 36-6-106(a)(8). Mother further asserts that it is unreasonable and "a blatant contravention of the priority policy of this State to protect sexually abused children" to require a parent to facilitate a close relationship with an abusive parent or run the risk of losing custody. Since she was acting pursuant to the DCS safety plan and in accordance with DCS's indication of abuse, Mother argues, factor 10 should not apply.

This court can appreciate that there are circumstances when reliance on factor 10 might be inappropriate. We do not, however, find this to be such a case. The trial court found that Mother engaged in a consistent pattern of statements and behaviors designed to establish abuse by Father. Without looking at the period of time covered by the DCS safety plan and indication, we find that the evidence does not preponderate against the trial court's finding that Mother exhibited an unwillingness to encourage and promote the child's relationship with Father. There are ample facts in the record to support a conclusion that, before the DCS investigation, Mother did not support a healthy relationship between Father and Child.

Mother also asserts that the trial court violated the Protective Parent Reform Act ("PPRA"), Tenn. Code Ann. § 36-6-112, which states:

(c) If a parent makes a good faith allegation based on a reasonable belief supported by facts that the child is the victim of child abuse, child neglect, or the effects of domestic violence, and if that parent acts lawfully and in good faith in response to that reasonable belief to protect the child or seek treatment for the child, then that parent shall not be deprived of custody, visitation, or contact with the child, or restricted in custody, visitation, or contact, based solely on that belief or the reasonable actions taken based on that belief.

(d) If an allegation that a child is abused is supported by a preponderance of the evidence, then the court shall consider such evidence of abuse in determining the visitation arrangement that is in the best interest of the child, and the court shall not place a child in the custody of a parent who presents a substantial risk of harm to that child.

This argument fails for several reasons. Mother never raised the issue of the PPRA below and therefore, the issue is arguably waived. Moreover, although the statute was not raised and the trial court thus did not tailor its findings to the PPRA, the trial court's findings support a determination that the requirements of the PPRA are not met in this case. The PPRA applies "[i]f a parent makes a good faith allegation based on a reasonable belief supported by facts . . . . " The trial court found that Mother's allegations of sexual abuse by Father were untrue, and that Mother had become preoccupied with the notion that Father was abusing the Child and refused to let go of that obsession despite the lack of evidence to support it. Thus, the trial court's findings indicate that Mother did not meet the "good faith" and "reasonable belief" requirements of the PPRA. In addition, the trial court's best interest determination was not "based solely on that belief [that the child was the victim of abuse] or the reasonable actions taken based on that belief." Tenn. Code Ann. § 36-6-112(c). The trial court relied on six of the factors set forth in Tenn. Code Ann. § 36-6-106(a) in deciding to change the primary residential parent to Father.

In its amicus curiae brief, Justice for Children ("JFC") argues that the trial court improperly relied on parental alienation syndrome ("PAS") in making its determination to change the primary residential parent. According to JFC, the Bernet/Walker report "demonstrates that their recommended switch in custody is based on the discredited 'junk science' of 'Parental Alienation Syndrome.'"[10] JFC further urges this court to hold that PAS is not admissible under Tennessee law.

The premise underlying the arguments of JFC is that Drs. Bernet and Walker based their recommendations upon the theory of PAS. We find no support for this premise in the record. Nowhere in the Bernet/Walker report is there any mention of or reference to PAS. At trial, Dr. Bernet was questioned by Mother's attorney concerning the symptoms of PAS and gave the following response: "I'm happy to discuss this, but I guess I should mention, that it doesn't pertain to this case. We did not say anybody in this case had parental alienation syndrome, but if you want me to, I can tell you about it." Although Mother's second expert, Dr. McMillan, addressed PAS in a letter critiquing the Bernet/ Walker report, he modified his position after hearing the testimony of Drs. Bernet and Walker: "[Dr. Bernet's] position was not that [PAS applied], and he said clearly that–there is no parental alienation of affection in this case. That's not what he was trying to convey. And I misunderstood that."

_____

[10] According to JFC, the proponents of PAS consider it to be a psychological disorder, arising almost exclusively in the context of custody disputes, in which one parent, usually the mother, programs or brainwashes a child to hate the other parent, usually the father.

There is no support for the position of amicus curiae that PAS formed the basis for the recommendation of Drs. Bernet and Walker. Evidence of PAS was not admitted in this case. We find no merit in the argument of JFC.

## Rule 60 motion

Mother argues that the trial court erred in denying her motion for Rule 60 relief and for recusal.[11]

Our review of a trial court's decision on a Tenn. R. Civ. P. 60 motion for relief is under an abuse of discretion standard. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003). Likewise, except in certain limited circumstances not applicable here, "the decision to recuse rests within the sound discretion of the trial court and its decision will be upheld unless a clear abuse of discretion is established." *Curry v. Curry*, No. M2007-02446-COA-R3-CV, 2008 WL 4426895, at *7 (Tenn. Ct. App. Sept. 18, 2008). A trial court abuses its discretion only when it applies an incorrect legal standard or when it reaches a decision against logic or reasoning that causes an injustice to the complaining party. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Under this standard, we are required to uphold the ruling "as long as reasonable minds could disagree about its correctness." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). Furthermore, "we are not permitted to substitute our judgment for that of the trial court." *Id*. Thus, under the abuse of discretion standard, we give great deference to the trial court's decision. *See Goins*, 104 S.W.3d at 479.

On March 5, 2009, Mother filed a Motion to Vacate Memorandum Opinion and Order and for Recusal. Mother's motion sets out the following factual basis for her motion:

> Respondent avers that, upon information and belief the following occurred since the Order was rendered and the matter appealed: Around the Christmas holidays, this Court, Judge Ross Hicks, saw counsel, Roger Maness, at a Christmas party given by a person named Larry Wilkes. Judge Hicks approached Mr. Maness and stated that he, Judge Hicks, believed he was going to report Mr. Greene to the Board of Professional Responsibility for

---

[11]In her reply brief, Mother also asserts that the trial court erred in allowing supplementation of the record on appeal with documents filed in a Davidson County Chancery Court case. These documents were not considered by the trial court in its decision and have not been considered by this court in reviewing the trial court's decision on appeal.

inappropriate conduct Judge Hicks personally alleged to have observed during the trial which resulted in the appealed Order. Judge Hicks stated to Mr. Maness that he believed Mr. Maness knew that Attorney Fred Greene had committed a violation of the Code of Professional Conduct because Mr. Maness had changed the seating arrangement between Mr. Greene and the Movant, Ms. Georgia Dunn Cone. Judge Hicks further stated that the basis of the report to the Board of [Professional] Responsibility would be that Mr. Greene was "holding hands" with Ms. Dunn Cone during the proceedings that were held in this Court and that the hand holding indicated an "inappropriate relationship" between the Respondent and her counsel.

Mother denied the existence of any improper relationship between herself and Mr. Greene and asserted that the trial court should have disclosed its concern during the proceedings to allow her and Mr. Greene to respond. Mother argued:

The Court's erroneous belief that an inappropriate relationship was happening while the case was ongoing, coupled with the Court's failure to disclose the belief at the time and Judge Hicks' comments at the Christmas party, would cause a reasonable person to believe that the Court was substantially biased against Ms. Dunn Cone and/or her counsel, and that such bias negatively affected the Court's decision to Respondent's prejudice.

Based upon this reasoning, Mother requested that the court vacate it orders entered on September 9, 2008, and December 2, 2008, and recuse itself from further proceedings. In support of her motion, Mother submitted her own affidavit as well as the deposition of Mr. Maness detailing his recollection of the conversation with Judge Hicks.

The trial court entered a memorandum opinion and order on June 15, 2009, denying both of Mother's requests for relief. The trial court concluded that an objective reading of the conversation in question would not lead a reasonable person to believe the conversation evidenced bias toward Mother or her attorney. Furthermore, the trial court emphasized that "any perception that the court may have had regarding the relationship between Ms. Dunn Cone and Mr. Greene arose as a result of the actual observance of witnesses and evidence given during the trial or in proceedings leading up to it." Thus, the observations were not extra-judicial and did not evidence a personal bias. The court stated that, "A judicial bias, i.e. a bias that arises because of conduct, observations or evidence occurring or presented during the proceedings, is not inappropriate and is unavoidable." Furthermore, the trial court

concluded that an overview of the proceedings did not support allegations of bias. Although he disagreed with certain of the court's rulings, Mr. Maness considered the proceedings to be fair and impartial.

On appeal, Mother emphasizes that the trial court should have disclosed its concern during the proceedings. In its memorandum opinion, the trial court noted that Mother "cited no authority which would have required the court to have done so." Mother's arguments on appeal do not provide any challenge to the legal principles applied by the trial court in denying her motion.[12] We find no abuse of discretion here.

We deny Father's request for attorney fees on appeal as we do not find this appeal to be frivolous.

CONCLUSION

The decision of the trial court is affirmed. Costs of this appeal are taxed against Mother, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[12]Recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). To disqualify a judge, bias "must stem from an extrajudicial source and not from what the judge hears or sees during the trial." *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998). The fact that a judge rules against a party does not necessarily indicate bias and is not a ground for recusal. *State v. Reid*, 213 S.W.3d 792, 816 (Tenn. 2006).